IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of<br><br>J.G. | No. 78338-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: June 24, 2019 |

CHUN, J. — After a 72-hour emergency detention for mental health evaluation and treatment, Auburn Multicare petitioned the trial court for an additional 14 days of involuntary treatment for J.G. They claimed he posed a likelihood of serious harm to others. After a probable cause hearing, the trial court concluded the State had met its burden of proof by a preponderance of the evidence and ordered the treatment. J.G. appeals, claiming (1) the State failed to provide sufficient evidence that he presented a likelihood of serious harm to others, and (2) the trial court failed to properly advise him of the impact that involuntary commitment would have on his right to possess firearms. Sufficient evidence supports the trial court's findings and conclusions that J.G.'s mental health gave rise to a likelihood of serious harm. Additionally, the trial court's failure to advise on the firearms issue was harmless error. Therefore, we affirm.

I.
BACKGROUND

On March 29, 2018, police responded to a call about J.G., a guest at the Extended Stay Hotel in Bellevue, Washington. J.G. displayed concerning

behavior–including paranoia, peeking around corners, and aggressiveness–that made staff and other guests feel uncomfortable. Upon finding J.G.'s room empty, two officers proceeded to search the hotel for him.

The officers found J.G. in a fourth floor stairway landing, sweating profusely and holding a pistol. According to one officer, he had a "thousand-yard stare" and "looked like he was in a different state of mind." The officers directed J.G. to drop the weapon. Although he did not comply immediately, J.G. soon dropped the pistol. The officers handcuffed J.G. and questioned him. They discovered the pistol was loaded, and that J.G. legally possessed the properly registered firearm. He also had a valid concealed pistol license.

J.G. explained that he had the gun because he feared for his life. According to J.G., his ex-girlfriend was being held against her will, possibly on the roof of the building. He believed men were chasing him as he tried to find and rescue her. After speaking with J.G., the officers decided to involuntarily transport him to Overlake Hospital for a mental health evaluation.

After transfer to Auburn Multicare Medical Center, J.G. was detained for 72 hours of psychiatric evaluation and treatment. On April 2, 2018, Auburn Multicare filed, and personally served J.G. with, a petition for an additional 14 days of inpatient treatment. The petition claimed J.G. suffered from a mental disorder presenting a likelihood of serious harm to himself and others.[1]

---

[1] The petition for involuntary commitment also included the ground that J.G. was "gravely disabled." The State did not raise this issue at the probable cause hearing and it was not a basis for the court's decision.

The petition stated that J.G. had been advised of the need for voluntary treatment but had not accepted it. The petition also asserted that J.G. had been advised that involuntary commitment pursuant to the petition would result in a loss of firearm rights.

The trial court conducted a probable cause hearing on April 4, 2018.[2] The court determined the State had shown by a preponderance of the evidence that J.G. presented a substantial risk of serious harm to others. The court found that "ongoing paranoia and delusions endorsed by the Respondent throughout his subsequent hospitalization and during his testimony in the probable cause hearing establish a continuing risk of harm to others based on the Respondent's perceived need to possibly defend himself with deadly force." The court committed J.G. to 14 days of inpatient mental health treatment. At the conclusion of the hearing, the trial court advised J.G. that he had lost his right to possess firearms as a result of the decision.

J.G. appeals.

## II.
## DISCUSSION

### A. Sufficiency of Evidence

The trial court granted the State's petition for 14 days of involuntary intensive mental health treatment on the ground that J.G. posed a likelihood of serious harm to others.[3] J.G. claims the trial court's decision to commit rested on

---

[2] The probable cause hearing was initially set to take place on April 3, 2018, but the State received a continuance due to the unavailability of a material witness.

[3] As an initial issue, the parties agree this case is not moot despite the expiration of J.G.'s commitment order. "An individual's release from detention does not render an appeal moot where collateral consequences flow from the determination authorizing such detention." In re

3

assumptions and unsupported findings resulting in insufficient evidence of a mental disorder. The State argues the credibility determinations and factual findings support the trial court's conclusions. We agree.

A court may order a person for 14 days of involuntary treatment if the State demonstrates by a preponderance of the evidence that, as a result of a mental disorder, the person presents a likelihood of serious harm or is gravely disabled. RCW 71.05.240(3); In re Detention of W.C.C., 193 Wn. App. 783, 785-86, 372 P.3d 179 (2016). A "mental disorder" is an organic, mental, or emotional impairment that "has substantial adverse effects on a person's cognitive or volitional functions." RCW 71.05.020(37). A "likelihood of serious harm" means "a substantial risk" of physical harm to self, others, or the property of others. RCW 71.05.020(35)(a). For a finding of substantial risk of harm to others, the State must demonstrate "behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm." RCW 71.05.020(35)(a)(ii).

Where, as here, the trial court has weighed the evidence, we limit our review to determining whether substantial evidence supports the findings and, if so, whether the findings support the conclusions of law and judgment. In re Detention of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998); W.C.C., 193 Wn. App. at 793. "Substantial evidence is 'evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.'" A.S., 91

---

Detention of M.K., 168 Wn. App. 621, 626, 279 P.3d 897 (2012). Commitment orders have collateral consequences because subsequent commitment proceedings consider prior history of involuntary commitment. RCW 71.05.012, .212, .245; M.K., 168 Wn. App. at 628-29. Given these consequences, J.G.'s appeal of his commitment order is not moot.

4

Wn. App. at 162 (quoting Holland v. Boeing Co., 90 Wn.2d 384, 390, 583 P.2d 621 (1978)). The challenging party must demonstrate that substantial evidence does not support a finding of fact. A.S., 91 Wn. App. at 162. We do not review credibility determinations. In re Detention of H.N., 188 Wn. App. 744, 763, 355 P.3d 294 (2015).

J.G. argues the trial court erroneously based its findings on the absence of evidence as shown by the trial court's statement that J.G.'s account was "too fanciful . . . to be considered as based in reality." Similarly, in discussing J.G.'s mental state, the trial court noted, "the police searched this hotel . . . and I didn't hear any testimony that they found anything out of the ordinary. There wasn't a paramilitary force, helicopters, people with guns, a large number of men in suits, or drug dealers or something else out to get [J.G.]." While J.G. contends these statements are unsupported by evidence, they stem from the trial court's conclusions about the credibility of various testimony.

The trial court expressly found the psychological testimony credible. Licensed clinical psychologist Bethany O'Neill testified that J.G. "has a significant delusional system in place that has perseverated throughout his hospital stay about people holding a friend or ex-girlfriend hostage, that there have been people after him." According to hospital records, J.G. felt that people were following him, and he heard voices and the sound of a rifle being loaded and cocked in the hallway outside his door. J.G. reported having an auditory hallucination and had recently sought a mental health evaluation. J.G. informed

hospital staff that he feared for his life and needed to protect himself. Dr. O'Neill noted J.G.'s poor insight into his mental health treatment needs:

> He still gets upset and believes that his delusional system is real, that it's all of us that just aren't understanding; no insight into the need for treatment or medication; freely admits and says that he will stop the medication once he leaves the hospital; denies the need for treatment and clearly has no insight into this situation and how clearly dangerous it is.

She also summarized the substantial risk of harm due to J.G.'s delusions: "This is a recipe for disaster if he's released today, as-is, and quite frankly, the danger is that he is going to inadvertently shoot someone because he believes his own delusions up through yesterday and/or get himself shot by police for brandishing a weapon."

The trial court based its findings on J.G.'s mental health on this psychological testimony, rather than merely the absence of evidence confirming the reality of his delusions. This testimony provides substantial evidence to support the trial court's findings about J.G.'s mental health, including that he "suffers from a mental/emotional impairment currently diagnosed as psychosis (not otherwise specified)," and that his "mental/emotional impairment has a substantial adverse effect on his cognitive and volitional functions, as evidenced by symptoms such as mood lability, significant delusional thought process, and paranoia."[4]

In addition to finding Dr. O'Neill's testimony credible, the trial court found J.G.'s testimony lacked credibility "insofar as it was substantially impacted by his

---

[4] The trial court's order includes these statements as conclusions of law. Findings of fact mislabeled as conclusions of law are reviewed as findings of fact. Willener v. Sweeting, 107 Wn.2d 388, 394, 730 P.2d 45 (1986).

delusional thought process." Furthermore, the trial court found credible the responding police officer's testimony as to his fear upon encountering J.G. in the hotel stairwell with a loaded weapon. These credibility determinations are not reviewable on appeal. See H.N., 188 Wn. App. at 763. Taking these credibility assessments into account, substantial evidence supports the trial court's finding that J.G. suffered from a mental disorder which placed another person in reasonable fear of harm. These findings of fact support the conclusion of law that J.G. posed a substantial risk of inflicting serious harm on another person. Therefore, we conclude the trial court did not err in ordering 14 days of involuntary treatment.

## B. RCW 71.05.240(2)

Under RCW 71.05.240(2), the trial court must notify the patient of the impact of involuntary commitment on the right to possess firearms during the probable cause hearing:

> If the petition is for mental health treatment, the court at the time of the probable cause hearing and before an order of commitment is entered shall inform the person both orally and in writing that the failure to make a good faith effort to seek voluntary treatment as provided in RCW 71.05.230 will result in the loss of [their] firearm rights if the person is subsequently detained for involuntary treatment under this section.

Here, the trial court informed J.G. of the loss of his firearm rights at the conclusion of the probable cause hearing and after announcing the order of commitment. The State concedes "the trial court neglected to give the statutorily required advisement in [J.G.'s] case."

7

J.G. contends the trial court's failure to comply with the notification requirements in RCW 71.05.240(2) deprived him of the opportunity to preserve his constitutional right to bear arms. However, J.G. did not raise the issue below. An appellate court may refuse to review any error not raised in the trial court. RAP 2.5(a). As an exception to this general rule, a party may raise a manifest error affecting a constitutional right for the first time on appeal. RAP 2.5(a)(3). "The defendant must identify a constitutional error and show how the alleged error actually affected the defendant's rights at trial." State v. Kirkman, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007). In supplemental briefing, J.G. acknowledged the failure to preserve the error below and argued manifest constitutional error subject to review under RAP 2.5(a).

Assuming, without deciding, that the trial court's failure to comply with RCW 71.05.240(2) amounts to a manifest constitutional error, the trial court's omission is subject to a stringent harmless error analysis. See State v. O'Hara, 167 Wn.2d 91, 99, 217 P.3d 756 (2009). "[T]he exception does not help a defendant when the asserted constitutional error is harmless beyond a reasonable doubt." State v. Scott, 110 Wn.2d 682, 687, 757 P.2d 492 (1988).

Here, the trial court did not provide the advisement required by RCW 71.05.240(2). However, J.G. received notice of the impact of involuntary commitment on his right to own a firearm through the petition for commitment. The petition for involuntary commitment stated that J.G. had been advised of the need for voluntary treatment but had declined. The petition also included the sworn statement that "respondent has been advised that involuntary commitment

8

pursuant to this 14-day petition will result in the loss of firearm rights."

Additionally, hospital staff noted that as he prepared for court, J.G. stated he did not want to lose his gun rights.

Based on the record, J.G. received the information that involuntary commitment would lead to the loss of his firearm rights. Moreover, the record lacks any indication that the advisement would have resulted in a different outcome. J.G. did not accept voluntary treatment. He demonstrated poor insight into his need for treatment and admitted he would stop medication after leaving the hospital. Therefore, the omission was harmless beyond a reasonable doubt.

While we reach the conclusion that the error was harmless, we emphasize that RCW 71.05.240(2) is mandatory. The advisement must be given in a probable cause hearing prior to entry of an order of commitment.

Affirmed.

_Chun, C.J._

WE CONCUR:

_____

_Mann, A.C.J._